**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**Kelli Wilson**,

                Plaintiff,

v.

**Ohio Department of Mental Health
     & Addiction Services,**

                Defendant.

**Case No: 2:20-cv-6184**

Judge Graham

## OPINION AND ORDER

Plaintiff Kelli Wilson brings this action for disability discrimination. Wilson alleges that she was denied accommodations for her disability by her employer, the Ohio Department of Mental Health and Addiction Services, and that the Department's alleged refusal to provide reasonable accommodations led to her termination, in violation of federal and state law.

This matter is now before the Court for consideration of Defendant's Amended Motion for Summary Judgment. (ECF No. 54.) For the following reasons, Defendant's motion is **GRANTED.**

## I.    FACTUAL BACKGROUND

Defendant Ohio Department of Mental Health and Addiction Services ("Department") is a state agency in Ohio. (ECF No. 54 at PAGEID 2291.) One of the Department's functions is to disburse funding to state organizations that provide mental health and substance abuse treatment to Ohio residents.

Plaintiff Kelli Wilson was an external auditor employed by the Department from 2013 until 2018. (Wilson Dep. 37-42, ECF No. 39.) Wilson worked as part of a four-person team that audited the organizations receiving disbursed federal and state funds, and the auditors worked in teams of two. (*Id*. at 44-45.) Auditors traveled to the organizations across the state to access relevant

1

documents and interview relevant persons. (*Id*.) The auditors also had in-office days where they wrote audit reports and conducted other administrative tasks. (*Id*. at 42-47.) Wilson was directly supervised by Chiwayi Lin, audit manager for the Department. (*Id*. at 44.)

Wilson was a bargaining-unit-employee member of the Ohio Civil Service Employees Association ("OCSEA") during her employment with the Department. (Thomson Dep. 11, ECF No. 29.) The Department was bound to certain courses of action with OCSEA members, including termination proceedings. (Spolarich Dep. 59, ECF No. 27.) One of the courses of action was last chance agreements, an intermediary mechanism used to resolve employment disputes without termination, in which the employee acknowledged they could be subject to greater discipline if they violate a work policy in the future. In 2016, Wilson signed a last chance agreement in which she admitted to violating HR-22, a policy related to improperly logging attendance. (Wilson Dep., Ex. 3.) In conjunction with this last chance agreement, she accepted a five-day working suspension. (*Id*.) The last chance agreement was in effect for two years, meaning if she violated another work policy or rule while it was in effect, she was subject to termination. (*Id*.)

### A. Wilson's use of the Family Medical Leave Act

At summary judgment, it is undisputed that Wilson suffers from mental health issues, including anxiety, depression, ADHD-C, and obsessive-compulsive personality disorder, and has been treated by a doctor. (Wilson Dep. 60.) For several years Wilson managed her symptoms by taking time off when needed using standard sick leave and personal time provided to all Department employees. (*Id*. at 72.) Wilson eventually decided she needed more time off due to the frequency of her flareups and applied for leave under the Family Medical Leave Act. (*Id*.)

To apply for leave under the FMLA, Wilson was required to submit medical documentation in support of her request. (Wilson Dep., Ex 5.) In her original application, her doctor certified her

to work a modified schedule, taking off one day every one to two weeks. (*Id*.) If Wilson had a flareup of her symptoms, she would take the day off and log the hours as FMLA leave. In May 2016, this schedule was approved and initially suitable for her needs. However, Wilson experienced more flareups than anticipated and took more time off to manage her symptoms than her doctor had certified. In September 2016, Wilson applied and was approved for a modification to her schedule to take off two to four days every two to eight weeks. (Wilson Dep., Ex. 7.)

Wilson maintained this schedule for several months, and in February 2017, she was informed by former Department Benefits Manager Sally Hammerstein and Bureau Chief for Human Resources Anne Thomson that she had used 445.9 of the maximum annual 480 hours of FMLA time. (Wilson Dep. 93-95.) She learned that FMLA hours become available a year to the day that they were used in the previous year, so she would not be able to use FMLA time until May 2017. (*Id*. at Ex. 9.) Wilson was told that she could be terminated for taking time off due to her disability if she did not have FMLA or sick leave, and that her remaining option to have time off and not face termination was to apply for the short-term disability benefit. (Wilson Dep. 96.) Wilson asked Hammerstein and Thomson whether there was another option to avoid termination besides short-term disability, such as unpaid leave, and was told no. (*Id*.)

### B. Wilson's use of Short-Term Disability

In March 2017, Wilson applied for and was approved for short-term disability, which she used for several months. (*Id*. at Ex. 12.) Wilson took sporadic bursts of short-term disability when her symptoms flared up, including: March 17, 2017-May 31, 2017; September 15, 2017-November 7, 2017; November 8, 2017-November 30, 2017 (part-time); December 1, 2017-January 3, 2018; January 4, 2018-March 31, 2018 (part-time); April 1, 2018-June 27, 2018; June 28, 2018-July 28, 2018 (part-time); and August 2, 2018-September 15, 2018. (*See generally* Wilson Dep.) By

September 15, 2018, Wilson exhausted her lifetime cap of short-term disability. (Wilson Dep., Ex. 31.)

### C. Wilson's Absences in July 2017

In July 2017, Wilson returned to work from her first use of short-term disability. In a communication with Hammerstein to prepare for her return to work, she was told that she was once again eligible to use FMLA time when needed. (Wilson Dep. 130-31.) On July 24-25, 2017, Wilson missed work and logged it as FMLA time. (Thomson Dep. 41.) Wilson was later called into a meeting with Thomson. (*Id*.) In this meeting, she learned that using her short-term disability benefit delayed her eligibility for FMLA leave because she had not worked enough hours in the preceding twelve months to qualify for leave under the FMLA. (*Id*.) She had not accrued sufficient sick leave, so these absences were considered unexcused. The time she took off with her short-term disability benefit also tolled the expiration of her last chance agreement, so it was still active at the time. (Spolarich Dep. 56-57.) Because Wilson took time off under the impression that she would be eligible to use FMLA hours after returning from short-term disability, Thomson assured Wilson that she would not receive punishment for missing those days of work without leave.

### D. Wilson Meets with Maisha Jones, ADA Coordinator

On March 5, 2018, Wilson contacted Human Capital Management Senior Analyst Lisa Winland and requested reasonable accommodations at work under the Americans with Disabilities Act. (Wilson Dep., Ex. 29.) Winland connected Wilson with Maisha Jones, the ADA Coordinator for the Department. (Winland Dep. 58-60, ECF No. 42.) Jones and Wilson discussed the accommodations process and Jones sent Wilson the reasonable accommodation paperwork to fill out. (Jones Dep. 47-49, ECF No. 30.) During the communications, Wilson inquired into the process for accommodations, and asked who was on the committee. (Jones Dep., Ex. 1.) Wilson

4

was informed Anne Thomson was one of the committee members. (*Id.*) Wilson also asked Jones whether she could reuse her short-term disability paperwork as evidence for her accommodations request but was told no. (*Id.*) Wilson never submitted an application, and in her deposition, claimed she was taking a different route to address her needs. (Wilson Dep. 209.)

### E. Wilson's Absence on July 11, 2018 and Related Termination Proceedings

Wilson missed work several times over the next few months but was able to use accumulated leave to cover it. On July 11, 2018, when Wilson was on a part-time disability leave schedule, she missed work due to a disability flareup. (Lin Dec. ¶ 11, ECF No. 54-1.) Wilson was under the impression that she received approval to use leave that had not yet been entered in the electronic payroll system and was instructed by her supervisor to submit a manual request for leave. (*Id.*) However, upon review of the request, Wilson was deemed to not have leave to cover this absence. (*Id.*) Under Department Policy HR-22, this absence was considered unexcused. (Spolarich Dec. ¶ 8, ECF No. 54-6.)

The Department initiated an investigation into Wilson's absence led by Laurie Spolarich, a labor relations officer at the Department. (Spolarich Dep. 9-18.) During the investigation, Spolarich gathered evidence from various employees at the Department. Spolarich subsequently met with Wilson as well as her OCSEA representative on October 3, 2018 to discuss the absence. (Spolarich Dec. ¶ 14.) Wilson provided information regarding the absence to Spolarich and was instructed to send Spolarich a written version of her statement. (*Id.*) Wilson never sent a written statement. (*Id.*) After the day of that meeting through October 18, 2018, Wilson started sending daily messages to Lin that she could not attend work due to her disability. (Lin Dec. ¶ 16.) Wilson did not work after October 4, 2018.

After Spolarich's meeting with Wilson, the Department scheduled a pre-disciplinary hearing to decide whether to recommend that the Department terminate Wilson. (Spolarich Dec. ¶ 21-23.) The hearing was held on November 5, 2018. (*Id*.) The Department notified Wilson of the date and time of the meeting, but she did not attend. (*Id*.)

During the hearing, the hearing officer reviewed the evidence, found disciplinary action was warranted, and decided to recommend Wilson's termination. (Spolarich Dec. ¶ 24.) The officer determined she violated Department policy HR-22 by missing work without available leave on July 11, 2018, as well as from October 4, 2018 until the hearing date. Her active last chance agreement also supported her termination. The recommendation was made to Dr. Mark Hurst, the Director of the Department at the time, who had final authority to decide whether to terminate her. (Hurst Dep. 13, ECF No. 33.) The Department drafted a letter, dated November 7, 2018, informing Wilson of her termination as of December 3, 2018. (ECF No. 40-2 at PAGEID 1678.) Her termination was officially approved, and the letter was signed by Dr. Hurst on November 14, 2018. The letter was not sent to Wilson. (*Id*.)

On or about November 15, 2018, Wilson's attorney, John Sauter, initiated contact with the Assistant Legal Counsel for the Department, Ashley Hegedus, to discuss Wilson's attendance and the associated disciplinary proceedings. (ECF No. 54-5 at PAGEID 2496.) On November 19, 2018, Hegedus offered Wilson, through Sauter, the option of resigning instead of being terminated so that she could continue to access her health insurance benefits through the end of the year. (*Id*. at PAGEID 2500.)

On November 27, 2018, Sauter and Hegedus spoke again. Hegedus had learned that Wilson was not interested in resigning, so she told Sauter that the Department was "going to move forward with termination." (*Id*.)

6

Later in the day, Sauter emailed Hegedus:

> Forgot to mention one thing on the phone. If the Department does terminate Kelli Wilson's employment, can you send me a copy of the letter that is sent to Kelli? I want to be sure that Kelli receives the letter since she is receiving in-patient treatment at this time.

(*Id*. at PAGEID 2505.) Hegedus replied:

> Thank you for the follow up. As previously discussed, the department has not received any documentation of Ms. Wilson's receipt of in-patient treatment, but I will be sure to forward on any correspondence regarding the status of Ms. Wilson's employment.

(*Id*.) On November 28, 2018, the agency sent the November 7, 2018 termination letter to Wilson via certified mail. (*Id*. at PAGEID 2507.) On December 3, 2018, Hegedus emailed Sauter the letter that was sent to Wilson. (*Id*. at PAGEID 2508.) On December 4, 2018, Wilson received an email with the termination letter. (ECF No. 56-1 at PAGEID 2588.) On December 5, 2018, Wilson received the hard copy letter in the mail. (*Id*.)

## II.    PROCEDURAL BACKGROUND

Wilson initiated this lawsuit on December 3, 2020, alleging violations of the Rehabilitation Act, 29 U.S.C. § 701, and Ohio R.C. Chapter 4112.02, *et. seq*. (ECF No. 1.) Following discovery, the Department filed a motion for summary judgment. (ECF No. 43.) In February 2023, this Court offered the Department the chance to amend its motion for summary judgment to assert a statute of limitations defense. (ECF No. 51.) On March 10, 2023, the Department submitted an amended summary judgment motion. (ECF No. 54.) Wilson timely submitted an addendum to her original response, and the Department replied. (ECF Nos. 56, 57.) The issues are now fully briefed and ripe for consideration.

## III.    STANDARD OF REVIEW

The Department has moved for summary judgment on each of Wilson's claims under Federal Rule of Civil Procedure 56. Under Rule 56, summary judgment is proper if the evidentiary

7

materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A district court considering a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum*, 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Revis*, 489 F.3d at 279–80 (quoting *Anderson*, 477 U.S. at 251–52).

"The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rule 56(c) requires "[a] party asserting that a fact cannot be or is genuinely disputed [to] support [that] assertion by citing to particular parts of materials in the record." Thus, "the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Poss v. Morris (In re Morris)*, 260 F.3d 654, 665 (6th Cir. 2001) (cleaned up).

## IV.    DISCUSSION

Wilson brings claims for alleged violations of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* and Ohio R.C. Chapter 4112.02, *et seq*. (ECF No. 1.) Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…

29 U.S.C. § 794. Wilson did not bring a claim under the Americans with Disabilities Act, which provides:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Wilson does not state why this lawsuit does not allege violations of the ADA, but it's likely because she did not file the suit in time to do so. Wilson filed a charge with the Equal Employment Opportunity Commission ("EEOC") asserting, under the ADA, the allegations she later submitted in her complaint. Subsequently, Wilson received a letter dated October 28, 2019 from the EEOC, informing her that the EEOC was closing its file on her charge because the charge was not filed timely. (ECF No. 1-2 at PAGEID 12.) The letter included a copy of Wilson's notice of suit rights, and informed Wilson that a lawsuit regarding the discrimination alleged in the suit under the ADA "must be filed within 90 days of your receipt of this notice; or your right to sue based on this charge will be lost." (*Id*.) December 3, 2020, the date this lawsuit was filed, is more than 90 days from the receipt of the letter.

Regardless, the ADA is still helpful in the Court's analysis of Wilson's claims. Sixth Circuit precedent is clear that "by statute, the Americans with Disabilities Act standards apply in

Rehabilitation Act cases alleging employment discrimination…[and] because the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other." *McPherson v. Michigan High Sch. Ath. Ass'n*, 119 F.3d 453, 459-460 (6th Cir. 1997). However, there are clear differences, such as the Rehabilitation Act's "sole-cause standard" that does not apply to claims under the ADA. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012).

Additionally, "given the similarity between the language used in the ADA and in Ohio Revised Code Chapter 4112, the Ohio Supreme Court has held that federal regulations and case law are applicable to disability discrimination claims brought under Ohio law." *Veltri v. DFS Servs. LLC*, 2011 U.S. Dist. LEXIS 93625, *41 (citing *Columbus Civil Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 1998 Ohio 410, 697 N.E.2d 204, 206-07 (1998)).

## A. Statute of Limitations

Before reaching the merits of Wilson's claims, this Court must analyze the defense made by the Department that Wilson's federal claims are barred by the statute of limitations. The statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1). "The burden is on the defendant to show that the statute of limitations has run, and if the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) (internal citations and quotations omitted).

The Sixth Circuit has applied Ohio's two-year statute of limitations governing personal injury actions to Ohio cases arising under the Rehabilitation Act. *See Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 292 (6th Cir. 2019) (citing *Bishop v. Children's Ctr. for Dev. Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010)). However, federal standards govern when the statute of

limitations period begins to run. *Id*. "Under federal law, the statute of limitations period begins 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Id*. (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)).

### 1. Consideration of Statute of Limitations

First, the Court will address Wilson's arguments related to whether the Court should consider the statute of limitations defense. Wilson alleges the Department failed to properly plead its statute of limitations defense by pleading insufficient facts in the Answer, and that the Department waived its statute of limitations defense by failing to pursue the defense. Wilson also alleges that allowing the Department to assert this defense after it allegedly failed to prosecute the statute of limitations defense until this juncture prejudices Wilson.

### a. Failure to Plead Statute of Limitations

The Court will first address Wilson's claim that the Department failed to properly plead the statute of limitations defense. Wilson contends that the Department's statute of limitations defense should be stricken from the Answer because it does not comport with the *Twombly/Iqbal* pleading standard required in complaints. The Sixth Circuit has not expressly held whether these pleading standards apply to affirmative defenses asserted in the Answer. *See Doe v. Bd. of Educ.*, No. 2:16-CV-524, 2017 U.S. Dist. LEXIS 133199, at *7-8 (S.D. Ohio Aug. 21, 2017) (collecting cases). However, the Court need not weigh in on this topic because Wilson's request does not align with Fed. R. Civ. P 12(f), which governs when a Court may strike an affirmative defense:

> (f) Motion to Strike. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
>
> (1) on its own; or
> (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

11

Wilson did not move to strike the Department's affirmative defense within 21 days after being served with the Answer. Wilson first raised this issue in her Supplemental Memorandum in Opposition to the Motion for Summary Judgment (ECF No. 56) after the Court offered the Department the opportunity to raise the statute of limitations in the Motion for Summary Judgment:

> The Court notes in the Answer, Defendant asserted, "[t]he applicable statute of limitations bars some or all of the claims in Plaintiff's Complaint." (Def's Answer, Doc. 6 at 46). Defendant has not asserted the statute of limitations as grounds for dismissal in its motion for summary judgment. The Court believes the facts of this case raise substantial issues regarding the statute of limitations defense. In the interests of judicial economy and expedited management of the case, the court believes it is appropriate to include consideration of the statute of limitations in the pending summary judgment proceedings.

(ECF No. 51 at PAGEID 2271.) The Court declines Wilson's request to strike this affirmative defense.

### b.  The Department's Alleged Waiver of Statute of Limitations Defense

Wilson alleges the Department waived the defense by failing to pursue it, and that allowing the Department to assert this defense prejudices Wilson. In support of her position, Wilson cites *Haskell v. Wash. Twp.*, 864 F.2d 1266 (6th Cir. 1988). In *Haskell*, the defendant failed to raise the statute of limitations defense in its answer, but three years into the litigation, argued that a claim should be dismissed based on the statute of limitations. The Sixth Circuit held that the defendant's failure to raise the limitations defense in a timely fashion constitutes a waiver. The Sixth Circuit emphasized that "since it is a waivable defense, it ordinarily is error for a district court to raise the issue *sua sponte*." *Id. at* 1273.

Unlike *Haskell*, the Court did not raise this defense *sua sponte*. Rather, the Department asserted the statute of limitations defense in its Answer. Once again, the Court offered the parties

12

the opportunity to brief the defense. Therefore, the Court declines to find that the statute of limitations was waived by the Department.

Wilson argues that allowing this defense deprived the "plaintiff of notice and of her opportunity to conduct discovery, assemble her evidence, and fully and fairly prosecute the essential dispositive issues of her case." (ECF No. 56 at PAGEID 2585.) This argument is not well taken. Since the statute of limitations defense was asserted in the Answer and therefore not waived, Wilson was on notice that the Department may assert the defense. Wilson had an adequate chance to conduct discovery on this defense during the discovery period. She also had an adequate chance to brief the defense and respond to the use of the defense during supplemental briefing.

### 2. Analysis of Statute of Limitations Defense

The Department alleges that Wilson's federal claims are time barred. Wilson brings two federal claims against the Department: disability discrimination based on wrongful termination and failure to accommodate. The Department is entitled to summary judgment on its statute of limitations defense only if there is no genuine issue of fact that the two-year limitations period expired prior to the date that Wilson filed this lawsuit. Wilson filed her complaint on December 3, 2020.

#### a. Wrongful Termination Claim

First, the Court will address the statute of limitations as it relates to Wilson's claim of disability discrimination based on wrongful termination. Wilson alleges that this cause of action accrued on December 3, 2018 at the earliest, the day that her attorney was informed of her termination. The Department alleges that the cause of action accrued on November 27, 2018, the day that the Department's Assistant Legal Counsel informed Wilson's attorney that the Department was moving forward with her termination.

13

In disability discrimination claims rooted in wrongful termination, a plaintiff's injury is their termination. Precedent instructs the Court that the "alleged discrimination occurred – and the filing limitations period commenced – at the time the [decision to fire] was made and communicated" to plaintiff. *Del. State College v. Ricks*, 449 U.S. 250, 258 (1980). The limitations period does not begin until the plaintiff learns of the final decision to terminate. *Endres*, 938 F.3d at 296 (statute of limitations period started "when [plaintiff] learned" that the panel "issued a final, non-appealable decision recommending his dismissal."). This is true even when the effects of the termination -- "the eventual loss of a [] position -- did not occur until later." *Ricks*, 449 U.S. at 258.[1]

Here, the Department drafted the letter to Wilson informing her of her termination on November 7, 2018. This letter was provided to Dr. Hurst, the Director of the Department and the person who had the final say in whether to terminate Wilson. Dr. Hurst signed the letter November 14, 2018. However, this letter was not mailed. Wilson alleges, and the Department does not dispute, that the limitations period did not commence on either date. Rather, the Department alleges that the limitations period commenced on November 27, 2018, the day on which Hegedus, the Department's Assistant Legal Counsel, informed Sauter, Wilson's attorney, verbally, via phone that the Department was going to "move forward with termination."

Wilson argues that the evidence submitted by the Department to support this theory is inadmissible hearsay. Hearsay evidence cannot be considered on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). Hearsay is an out of court statement made for the truth of the matter asserted. The evidence submitted to support the allegation that Hegedus

---

[1] The Department admitted it terminated Wilson on December 3, 2018. (ECF No. 6 at PAGEID 41.) However, the statute of limitations begins to run on the day Wilson knew that her termination was final, not the day she was terminated, so it does not matter when she was terminated.

informed Sauter of Wilson's termination is an email sent from Hegedus to other staff members of the Department. In the email, Hegedus informs these staff members that she told Sauter via phone that the Department was moving forward with her termination:

> I spoke to Ms. Wilson's attorney today. I informed him that we are going to move forward with termination, as Ms. Wilson is not interested in resigning any longer. Please go ahead and send the letter. I think we need to send it both certified and regular mail.

(ECF No. 54-5 at PAGEID 2504.) Wilson argues that this email is hearsay evidence. The Department did not present a rebuttal argument to this email's inadmissibility.

This email is an out of court statement. It is offered to prove that Wilson knew on November 27, 2018 that she would be terminated. Whether Wilson's complaint was timely filed depends on when Wilson knew that the Department decided to terminate her employment. Therefore, this evidence is presented by the Department for the truth of the matter asserted, this email is hearsay, and it is not admissible.

However, the Court has reviewed the email in question, and even if it is considered, the Department has not met its burden to prove that the statute of limitations expired before Wilson filed her lawsuit. For the limitations period to begin, the Department must have communicated the final decision of termination to Wilson.

Hegedus's statement to Sauter is not a communication that Wilson's termination is final because Hegedus's statement that they were "going to move forward with Wilson's termination" does not communicate a final decision to terminate Wilson. Sauter's email saying "if the Department does terminate Kelli" supports the conclusion that the decision was not understood to be final by Sauter or Wilson. Hegedus's subsequent email to Sauter, informing him she will forward any communication "regarding the state of Wilson's employment" is similarly vague and does not communicate a final decision to terminate Wilson.

15

Wilson maintains that she did not receive communication that her termination was final until December 4, 2018 when she received a copy of the November 7, 2018 termination letter via email. The Department cites *Roulier v. Wasserstrom*, 791 F.2d 935, 1986 WL 16853 at *3 (6th Cir. 1986) to support the claim that Sauter's knowledge that Wilson was terminated is imputed to Wilson. Therefore, the Department further asserts, Wilson received communication that her termination was final on December 3, 2018, the day that Sauter received Hegedus's email with the November 7, 2018 termination letter. Even if her attorney's knowledge is imputed to Wilson, it does not impact the lawsuit's timeliness because Sauter did not receive the November 7, 2018 termination letter until December 3, 2018, which is still in the limitations period. Because Wilson's injury is her termination, and Wilson's lawsuit was filed on December 3, 2020, the statute of limitations does not bar this disability discrimination claim.

### b. Failure to Accommodate Claims

The Court now addresses the statute of limitations as it relates to Wilson's claim that the Department failed to accommodate her disability in violation of the Rehabilitation Act. The Department alleges that Wilson's failure to accommodate claims are barred by the statute of limitations under the theory that, even viewing all facts in favor of Wilson, the requests that she allegedly made were outside of the limitations period extending from December 3, 2018 until December 3, 2020.

Although the limitations period typically starts to run when a plaintiff learns of the injury that is the basis of their action, the continuing violations doctrine provides plaintiffs with legal recourse for violations of the Rehabilitation Act when the actions are not distinct but rather occur over a long period of time.

Under the continuing violations doctrine, a complaint is timely where the plaintiff can show discriminatory activity that continues into the present, as opposed to prior discriminatory activity with effects which continue into the present. *Bell v. Ohio State University*, 351 F.3d 240, 247 (6th Cir. 2003). The Supreme Court held in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) that although the continuing violations doctrine does not permit recovery for discrete acts of discrimination that occur outside the statutory period, it does apply in hostile work environment actions under Title VII. *Id*. at 113. "The plaintiff has the burden to prove that the continuing violation doctrine applies." *Holmes v. Novo Nordisk Inc.*, 2022 U.S. Dist. LEXIS 57959, *7-8 (citing *Pittman v. Spectrum Health Sys.*, 612 F. App'x 810, 814-15 (6th Cir. 2015)).

Wilson alleges that the continuing violations doctrine applies because Wilson made continual requests to be accommodated and was continually denied. She alleges the nail in the coffin was her termination. Construing the facts in her favor, Wilson made several discrete attempts to request accommodations with the Department. Wilson alleges she attempted to request accommodations for her disability at least three times. Her first alleged request occurred during her meeting with Thomson and Hammerstein in February 2017, when she was informed she was approaching the 480-hour annual cap of FMLA leave. Wilson asked if there was a way she could continue to take leave in a manner similar to her FMLA leave, and Hammerstein suggested short-term disability but neglected to initiate the interactive process for an accommodation under the ADA. The statute of limitations on that claim started on that day and expired two years later in February 2019.

She made her second request after she used FMLA leave on July 24-25, 2017 when she was not eligible. At a meeting discussing these absences, she alleges she requested a special bank

of leave to use when needed in lieu of the FMLA leave that she could not use due to lack of hours worked. The statute of limitations on that claim started on that day and expired two years later in July 2019. The third request was in March 2018, when she explicitly asked for an accommodation and was subsequently connected to Maisha Jones.[2]

Wilson seeks to hold the Department liable for separate instances in which she requested accommodations and was denied. These instances are separate even though she alleges several similar instances of the Department's failure to accommodate her.

Furthermore, Wilson does not properly assert a hostile work environment claim. The actions of the Department do not collectively constitute "one unlawful employment practice." *Morgan*, 536 U.S. at 118. Her claim is based on a series of instances in which the Department denied her specific requests for accommodation for her disability. These instances are discrete requests for accommodation. Wilson made the last of her requests for an accommodation in the form of extra leave in March 2018, and on that occasion, the Department initiated the interactive process as required by the ADA, but Wilson herself refused to participate in the process. *See supra* pp. 4, 5; *infra* pp. 22, 23. The alleged continuous discriminatory practice was not ongoing at the time of her termination, and the continuing violations doctrine does not apply. Accordingly, all of Wilson's alleged denial of accommodation claims are barred by the federal two-year statute of limitations.

---

[2] The list of alleged requests for accommodation also include the following instances: "On or about January 28, 2016, Ms. Wilson asked Chiwayi Lin to take vacation leave in lieu of sick leave….On or about September 13, 2017, Ms. Wilson asked Chiwayi Lin to provide flex time, vacation in lieu of sick leave, or unpaid leave. On or January 11, 2018, Ms. Wilson asked Chiwayi Lin to provide flex time. (Granted) In or around November 2017 to January 2018, Ms. Wilson verbally asked Chiwayi Lin for accommodations, including work from home. On or about July 18, 2017, Ms. Wilson made written and electronic request to use vacation leave in lieu of sick leave. On or about September 26, 2018, Ms. Wilson made a written request for flex time as a reasonable accommodation to Chiwayi Lin. On or about September 28, 2018, Ms. Wilson requested flex time schedule and/or to use vacation or personal leave in lieu of sick leave." (ECF No. 39-2 at PAGEID 1308.)

In sum, Wilson's claim against the Department for disability discrimination based upon wrongful termination was filed timely under federal and state law and can be evaluated on the merits. Wilson's federal claims that the Department failed to accommodate her disability are time-barred by the two-year statute of limitations, and summary judgment is **GRANTED** to the Department on those federal claims. Her state law failure to accommodate claim is not barred by Ohio's six-year statute of limitations. *See infra*, Section IV.E.

**B. Disability Discrimination Claim under the Rehabilitation Act**

Wilson's sole surviving federal claim is disability discrimination based on wrongful termination. To prove a claim for disability discrimination under the Rehabilitation Act, a Plaintiff must prove the following:

> (1) The plaintiff is a "handicapped person" under the Act;
> (2) The plaintiff is "otherwise qualified" for participation in the program;
> (3) The plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program **solely** by reason of his handicap; and
> (4) The relevant program or activity is receiving Federal financial assistance.

*Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1988) (emphasis added). For purposes of this motion, it is undisputed that Wilson has a disability that renders her handicapped under the Act, and that the Department receives federal financial assistance. (ECF No. 54 at PAGEID 2293 (describing how the Department disburses funds across the state and "federal and state funds are used for the intended purpose.").)

A plaintiff may prove a Rehabilitation Act violation through direct or indirect evidence and the claim is analyzed under the framework based on the evidence a plaintiff presents. *Bledsoe v. TVA Bd. Of Dirs.*, 42 F.4th 568, 580 (6th Cir. 2022). A direct evidence framework is used when a plaintiff presents evidence that proves the existence of a fact without requiring the fact finder to draw any inferences, in this case, that Wilson was terminated because of her disability. *Hostettler*

*v. Coll. Of Wooster*, 895 F. 3d 844, 853 (6th Cir. 2018). Conversely, an indirect evidence framework is used in the absence of direct evidence when a plaintiff lacks evidence that she was terminated due to her disability. The Department asserts that an indirect evidence framework is necessary to evaluate Wilson's claims because allegedly, the Department "did not rely on Wilson's alleged disability when it made the decision to terminate" her. (ECF No. 54 at PAGEID 2313.) Wilson analyzes this claim using the direct evidence framework.

Employers are required to make reasonable accommodations to employees who are disabled within the meaning of the Rehabilitation Act. In a wrongful termination context, an employer's failure to accommodate its employee is direct evidence of disability discrimination. *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018) (citing *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007)). Therefore, employees that can prove their employer failed to accommodate them, and that the employee's inadequacies that led to their termination would have been prevented if the employer had accommodated the employee, have proven disability discrimination by direct evidence. *See McPherson v. Mich. High Sch. Ath. Ass'n*, 119 F.3d 453, 460 (6th Cir. 1997) (en banc). ("In the employment context, failure to consider the possibility of reasonable accommodation for known disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to discharge solely because of the disabilities.")

On July 11, 2018, Wilson called off work because she had a flareup of her disability. The Department argues this absence renders Wilson unqualified for the position. However, absenteeism that can be cured with a reasonable accommodation is treated differently. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 418 (6th Cir. 2020). Since there is no dispute the absences in question were due to disability, they do not automatically render Wilson unqualified. If Wilson

can prove the Department failed to consider the possibility of a reasonable accommodation, and that accommodating her would have prevented the inadequacy for which she was terminated, she has proven her claim of disability discrimination by wrongful termination. As Wilson's wrongful termination claim is based on the Department's failure to offer a reasonable accommodation, it involves direct evidence of discrimination.

Here, Wilson alleges she requested a bank of leave to use on a sporadic basis when her disability prevented her from coming to work. According to Wilson, this bank of leave was meant to account for the additional days she needed off work due to her disability, and subsequently, to prevent her termination based on absenteeism. Wilson alleges the Department "refused to grant Ms. Wilson's requests, and continued to do so, culminating in and resulting in Ms. Wilson's extended absence and termination on December 3, 2020." (ECF No. 56 at PAGEID 2580.)

The Sixth Circuit has acknowledged that a neutral policy cannot defeat direct evidence that a defendant failed to accommodate a plaintiff because "a company may not illegitimately deny an employee a reasonable accommodation to a general policy and use that same policy as a neutral basis for firing" the plaintiff. *Dolgencorp*, 899 F.3d at 435. The Department claims it had a nondiscriminatory, neutral reason for terminating Wilson, and therefore, they could not have terminated Wilson based on her disability. Specifically, the Department contends that while Wilson could have been terminated for her unexcused absence on July 11, 2018 alone, she was ultimately terminated for violating Department Policy HR-22, Code of Conduct and General Rule 5: more than 40 hours of unauthorized leave. (Spolarich Dep 50, 56.)

On July 11, 2018, Wilson missed work because of her disability. She did not have available sick leave to cover this absence. She alleges that if she had been granted her accommodation, it

would not have mattered whether she had available sick leave to cover this absence because she would have used her accommodation to cover this absence.

However, Wilson cannot prove that the Department's failure to accommodate her led to her termination because the facts, even construed in favor of Wilson, show that the Department attempted to engage in the interactive process with Wilson prior to the unexcused absence that led to Wilson's discharge. The Department cannot be said to have failed to consider the possibility of a reasonable accommodation, nor can it be said that accommodating her would have prevented the inadequacy for which she was terminated, when the facts show that the Department attempted to accommodate her. In March 2018, Jones spoke with Wilson about the Department's ADA accommodation application process and provided Wilson the required paperwork to begin the accommodation process. After learning that Thomson was on the committee, and after Jones told Wilson that Wilson could not reuse her paperwork from her application for short-term disability benefit, Wilson did not submit her application. Wilson declined to pursue her application even after Jones reconnected with Wilson several times over the following months. Wilson stated in her deposition that she gave up going through the route of applying for accommodations formally. (Wilson Dep. 209.)

Wilson refused to engage in the interactive process as outlined by the Department, so the Department is not to blame for Wilson not having an accommodation on July 11, 2018. Even though an attendance accommodation could have prevented her absence on July 11, 2018 from being considered unexcused under the Department's policy, the Department did not unreasonably deny her accommodation in March 2018. It was Wilson herself who caused a breakdown in the interactive process, so there is no genuine dispute of material fact that the Department did not fail to accommodate Wilson in March 2018, nor is there a dispute of material fact that no alleged prior

failure of the Department to accommodate Wilson led to her discharge. Although the alleged requests in February 2017 and July 2017 might have led to a failure to accommodate claim, in consideration of Wilson's wrongful termination claim, the Department's later-in-time attempt to engage in the interactive process in March 2018 negates these earlier allegations. Wilson cannot refuse to participate in the accommodations process then claim that she was fired because of an inadequacy that could have been prevented if the Department had accommodated her.

As no alleged instance of the Department's failure to accommodate Wilson could have prevented an inadequacy that led to her discharge, Wilson has not presented sufficient facts upon which a reasonable jury could find in her favor on her claim of disability discrimination based on wrongful termination. Summary judgment as to Wilson's claim of disability discrimination, based on wrongful termination is **GRANTED.** [3]

### C. Retaliation Claim

In the complaint, Wilson alleged one count of retaliation against the Department. In her response in opposition to her motion for summary judgment, Wilson abandoned this claim. (ECF No. 47 at PAIGEID 2230, n.1.) This Court declines to consider the merits of this claim and summary judgment is **GRANTED** in the Department's favor. *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011).

### D. State Law Disability Discrimination Claim

As already discussed, federal standards are applicable to claims brought under Ohio R.C. Chapter 4112.02, *et. seq*. For the same reasons that this Court has granted summary judgment to

---

[3] Wilson's claim also fails under an indirect evidence framework because there is no dispute of material fact that the Department had a legitimate, nondiscriminatory reason for her termination. She also fails to show how this reason was pretextual.

23

the Department based on Wilson's disability discrimination wrongful termination claim, summary judgment is **GRANTED** as to Wilson's state law disability discrimination claim.

### E. State Law Failure to Accommodate Claim

Although Wilson's federal failure to accommodate claim is time barred, Wilson's state law failure to accommodate claim is not. While federal Rehabilitation Act claims in Ohio are subject to a 2-year statute of limitations, claims under Ohio R.C. Chapter 4112.02, *et. seq*. are subject to a six-year statute of limitations. *Cosgrove v. Williamsburg of Cincinnati Mgmt. Co.*, 70 Ohio St. 3d 281, 282, 638 N.E.2d 991 (1994). Wilson's allegations regarding the Department's failure to accommodate her disability occurred within this six-year period.

When only state law claims remain, the Court has discretion as to whether to exercise supplemental jurisdiction. In determining whether to exercise supplemental jurisdiction, federal courts balance the values of judicial economy, convenience to parties, fairness, and comity to state courts. *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. 2011).

Balancing these factors, the Court declines to retain supplemental jurisdiction over Wilson's remaining claim. Primarily, Wilson has the opportunity to refile this claim in state court. In addition to the six-year statute of limitations in state court, the filing of a federal complaint tolls the statute of limitations while the claim is pending in federal court and adds a period of 30 days to the limitations period after dismissal. *See* 28 U.S.C. § 1367(d). The Supreme Court has interpreted this statute to mean that the pendency of the federal court claim "stop[s]-the-clock" of the state statute of limitations. *Artis v. District of Columbia*, 138 S. Ct. 594, 598 (2018). Wilson's ample opportunity to refile her claim leads the Court to decline supplemental jurisdiction over this claim.

V.        **CONCLUSION**

For the reasons stated above, the Department's motion (ECF No. 54) is **GRANTED** as to Wilson's failure to accommodate claim, wrongful termination claim, and retaliation claims under the Rehabilitation Act and her wrongful termination claim under Ohio law. The motion is **DENIED** regarding Wilson's Ohio law failure to accommodate claim, and the Court declines to exercise supplemental jurisdiction over this claim.

**IT IS SO ORDERED.**

*s/ James L. Graham*
JAMES L. GRAHAM
United States District Judge

DATE: November 28, 2023